UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------X
UNITED STATES OF AMERICA,


    - against -                         **MEMORANDUM & ORDER**
                                                17-CR-339 (RRM)

CHRIS MESSALAS,

               Defendant.
--------------------------------------------------X
ROSLYNN R. MAUSKOPF, United States District Judge.

      On June 28, 2017, defendant Chris Messalas was indicted and charged with conspiracy to

commit securities fraud and conspiracy to commit money laundering in violation of 15 U.S.C. §

78j and 18 U.S.C. §§ 371, 1956.  Before the Court are (1) Messalas's motion to suppress the

fruits of a four-month wiretap on his cell phone, (2) his motion to compel discovery of

documents containing information on particular topics, and (3) his motion to compel the return

of certain electronic devices seized in the search of his home.[1]  (Suppression Mot. (Doc. No.

143).)  After carefully considering the evidence and the parties' submissions, and for the reasons

set forth below, Messalas's motions are denied.

## BACKGROUND

I.      **The Investigation**

      Beginning in 2015, with the help of a confidential cooperating witness (the "Cooperating

Witness" or "CW") and a Confidential Source, the Government conducted an investigation into

Messalas's business dealings, in particular his involvement with a conspiracy to artificially

inflate and then sell shares of BioCube, Inc.  (*See generally* October 2016 Wiretap Aff. ("Aff."),

---

[1] Also pending before the Court is Messalas's motion to suppress the fruits of a search of his home pursuant to a warrant.  The Court will address this motion in a forthcoming order.

Ex. A2 to Gov't Opp'n (Doc. No. 149-1).)  In October 2016, after over a year of investigation that relied heavily on recordings made by the CW, the Government applied for a wiretap of Messalas's cell phone pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III"), Pub.L. No. 90–351, 82 Stat. 197, 217.  In support of the application, the Government submitted a 65-page affidavit sworn by F.B.I. Special Agent Christopher M. Donohue (the "Affidavit"), which explained why there was probable cause to believe Messalas was committing wire fraud, securities fraud, and money laundering, and explained why a wiretap was necessary to complete the investigation.  (*See* Aff. at ¶¶ 14–91.)  On October 13, 2016, then-District Judge Richard Sullivan granted the application.  (October 2016 Wiretap Order, Ex. A3 to Gov't Opp'n (Doc. No. 149-1) at 87–98.)[2]  Subsequently, in each of the three following months, the Government submitted substantially similar reauthorization applications supported by affidavits of Special Agent Donohue, and Judge Sullivan granted each one.  (Exs. B1, B2, B3, B4, B5, B6, B7, C1, C2, C3, C4, D1, D2, D3, D4 to Gov't Opp'n (Doc Nos. 149-2, 149-3, 149-4).)  Familiarity with the content of these documents is presumed for the purposes of this Order.

In April 2017, Magistrate Judge Pollak issued warrants for Messalas's arrest and the search of his home.  (Arrest Warrant, Ex. E1 to Gov't Opp'n (Doc. No. 149-5) at 2–3; Search Warrant, Ex. F1 to Gov't Opp'n (Doc. No. 149-6) at 2–8.)  The search warrant specifically incorporated two attachments.  Attachment A identified Messalas's home as the property to be searched.  (Search Warrant at 3.)  Attachment B limited seizure to "all records relating to" (a) securities fraud, money laundering, wire fraud, and conspiracy to commit the same; (b) involving Messalas and four suspected co-conspirators; (c) occurring after June 1, 2011.  (*Id.* at 4–5.)

---

[2] Citations to documents filed on the docket use pagination assigned by the Electronic Case Filing system.

Attachment B went on to give illustrative examples of the sorts of items to be seized. (*Id.*) Familiarity with the warrant is also presumed for the purposes of this Order.

On the morning of April 14, 2017, F.B.I. agents executed both warrants at Messalas's residence. Pursuant to the warrant, the agents seized numerous paper documents and electronic devices. They also requested, and received, Messalas's written consent to search his iPhone. (Consent, Ex. G to Gov't Opp'n (Doc. No. 149-7) at 2.) With the exception of this iPhone, the Government has since returned all electronic devices and disclaimed intent to use them at trial. (Gov't Opp'n (Doc. No. 148) at 43.)

## II.    The Instant Motions

Through the three instant motions, Messalas seeks the suppression of all evidence seized pursuant to the wiretap, discovery of information primarily related to the affidavit submitted in support of the wiretap application, and an order directing the Government to delete any images it has retained of electronic devices seized in the home search.

### A.    The Wiretap

With respect to the wiretap, Messalas argues he is entitled to a hearing and suppression pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), because Special Agent Donohue's Affidavit was "replete with misstatements and material omissions of fact." (Suppression Mot. at 18.) These alleged misstatements and omissions include: (1) failing to disclose certain information about the Confidential Source's involvement with another company associated with Messalas, Therabiogen; (2) overrepresenting Messalas's ownership share in BioCube; (3) failing to disclose details of the CW's criminal history; (4) assuming without basis that a parallel SEC investigation would not be fruitful; (5) inaccurately stating that the CW had successfully made contact with multiple suspected members of the conspiracy; and (6) incorrectly implying that

Messalas's old text messages were irretrievable. Messalas adds that the Affidavit failed to establish the necessity of the wiretap because, in addition to the foregoing, it offered unconvincing explanations for why the use of alternative investigative techniques – including the use of an undercover agent and the then-ongoing search through Messalas's emails – were insufficient.[3]

Last, Messalas argues that suppression is appropriate for the separate reason that he was essentially being investigated only for securities fraud, a crime for which Title III does not authorize use of wiretaps. (*Id.* at 30.) The other crimes alleged in the Affidavit, he says, were nothing more than "a cover manufactured to obtain the wiretap." (*Id.*)

### B.      Motion to Compel Discovery

Next, Messalas asks the Court to compel discovery of documents containing information on five different topics: (1) details regarding the government's review of Messalas's email; (2) information related to why the government's undercover agent "was not able to advance the investigation by meeting with other alleged co-conspirators"; (3) information "as to why the SEC declined to pursue any case against Mr. Messalas relating to the conduct charged in this case"; (4) information related to "why the government's investigation of Mr. Messalas in 2010 and 2011 did not result[] [in] any criminal charges"; and (5) "information known to the government at the time of the submission of the Wiretap Affidavit concerning the CW that was not presented

---

[3] Messalas also appears to argue that these omissions, inaccuracies, or wanting portions of the Affidavit collectively fail to satisfy the "full and complete statement" requirement of Title III, *see* 18 U.S.C. § 2518(1)(b)–(c), notwithstanding the fact that *Franks* effectively permits incomplete statements so long as the incompleteness was immaterial to establishing probable cause, the product of negligence or mistake, or both. *See Franks*, 438 U.S. at 171. This argument was squarely addressed and rejected by the Second Circuit in *United States v. Rajaratnam*, 719 F.3d 139, 151 (2d Cir. 2013), when it held that the *Franks* standard appropriately controls the inquiry into Title III suppression motions. It observed that, despite the "full and complete statement" requirement, "the use of the *Franks* standard is consistent with the purposes of Title III, and if anything, *Franks* enhances the protection of . . . defendants, by applying to the wiretap statute an important constitutional principle that has been accepted by all courts." *Id.* (alterations omitted) (citations omitted).

to the authorizing district judge." (Suppression Mot. at 39–40; *see also* Reply at 18 n.9.) With the exception of the request for information related to the email search, Messalas's sole stated basis for these requests is to strengthen his arguments for suppressing the fruits of the wiretap. (Reply at 18 n.9.) Messalas states that information related to the email search would also serve this purpose, but might support other motion practice as well. (Suppression Mot. at 39.)

### C. Motion to Compel the Return of Electronic Devices

Finally, Messalas had initially moved to compel the return of certain electronic devices seized by the Government in the search of his home. (Suppression Mot. at 38.) The Government subsequently returned the devices it had seized, with the exception of Messalas's iPhone. (Gov't Opp'n at 43.) In his reply memorandum, Messalas acknowledges that these items have been returned, but requests pursuant to Federal Rule of Criminal Procedure 41(g) that the Court direct the Government to delete any electronic images of those devices that the Government has retained. (Reply at 19 n.10.)

### DISCUSSION

For the reasons explained next, the Court finds each of Messalas's arguments to be unavailing. Accordingly, his motions are denied.

### I. The Wiretap

Title III authorizes federal judges to order the interception of wire, oral, or electronic communications, and it sets forth the procedure by which the Government may apply for such orders. *See* 18 U.S.C. §§ 2516, 2518. In a wiretap application, the Government must supply, *inter alia*, "details as to the particular offense that has been, is being, or is about to be committed," and "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if

tried or to be too dangerous." *Id.* § 2518(1)(b)–(c). In other words, the Government must show probable cause to believe a crime is or was afoot and the necessity of using a wiretap to investigate that crime. *See United States v. Kirk Tang Yuk*, 885 F.3d 57, 77–78 (2d Cir. 2018) (discussing the "probable cause" and "necessity" elements of wiretap applications); *United States v. Rajaratnam*, 719 F.3d 139, 151–52 (2d Cir. 2013) (same). If the judge is satisfied as to these elements – and two others not relevant here – she may issue the wiretap order. *See* 18 U.S.C. § 2518(3).

When a defendant seeks to suppress the fruits of a wiretap on the grounds that the application misled the authorizing judge, his motion is analyzed under the framework established by the Supreme Court in *Franks*. *Rajaratnam*, 719 F.3d 139 at 151. "The *Franks* standard is a high one." *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991). To be entitled to a *Franks* hearing and ultimately to suppression of wiretap evidence, "a defendant must make a 'substantial preliminary showing' that: (1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the judge's probable cause [or necessity] finding[s]." *United States v. Salameh*, 152 F.3d 88, 113 (2d Cir. 1998) (citing *United States v. Levasseur*, 816 F.2d 37, 43 (2d Cir. 1987)); *see also Franks*, 438 U.S. at 171–72; *Rajaratnam*, 719 F.3d at 146. In other words, a defendant must show the claimed inaccuracies or omissions were both (1) "designed to mislead" or "made in reckless disregard of whether [they] would mislead" and (2) materially false. *Rajaratnam*, 719 F.3d at 153–54 (citation omitted). "If, after setting aside the allegedly misleading statements or omissions, the affidavit, nonetheless, presents sufficient information to support a finding of probable cause [and necessity], the district court need not conduct a *Franks* hearing." *Salameh*, 158 F.3d at 113 (citing *Levasseur*, 816 F.2d at 43). "To mandate an

evidentiary hearing, the challenger's attack [on the affidavit] must be more than conclusory and must be supported by more than a mere desire to cross-examine." *Franks*, 438 U.S. at 171.

**A.      Messalas Has Not Shown He Is Entitled to a Hearing or to Suppression Under *Franks***

Messalas points to six specific inaccuracies or omissions in the detailed, 65-page Affidavit that he says are material and show Special Agent Donohue recklessly disregarded the truth or intentionally lied.  For differing reasons, none of them – together or individually – satisfies the defense's burden under *Franks*.  First, several of them are not, in fact, inaccuracies or omissions.  Second, the few that are omissions are not material to the probable cause or necessity showings required by Title III, and Messalas has not offered any basis to conclude they were intentional or the product of reckless disregard for the truth.

**i.      Probable Cause**

**a.      The Confidential Source's Involvement with Therabiogen**

In making the case for probable cause, the Affidavit states that, in 2009 and 2010, using materially false information provided by Messalas, the Confidential Source induced investors to buy shares of the company Therabiogen.  (Aff. at ¶ 24.)  As a result, "the Confidential Source was convicted of federal charges of securities fraud and income tax evasion upon a guilty plea on or about April 2, 2014." (*Id.*)  It adds that, the "Confidential Source's information is consistent with information provided by [the CW]." (*Id.*)  In the subsequent reauthorization requests, Special Agent Donohue omitted most of this information from his affidavits, instead stating only that the FBI had "received information from a Confidential Source that Messalas was engaged in securities fraud." (*See, e.g.*, First Reauthorization Aff., Ex. B2 to Gov't Opp'n (Doc. No. 149-2) at ¶ 17.)

After some initial confusion about whether the Government stood by the statements in the Affidavit – which it does[4] – Messalas argues they are incomplete.  For example, the Affidavit does not explain why Messalas was not also prosecuted.  Messalas theorizes this may be because the Confidential Source was a failed cooperator – something the Affidavit should disclose if true.  (Reply (Doc. No. 154) at 17–18.)  Messalas further suspects that the comparative lack of detail about the Confidential Source in subsequent reauthorization requests evidences the Government's recognition that something about the Affidavit was inaccurate.  (*Id.*)

This amounts to speculation and guesswork, not a "substantial showing" of materiality or dishonesty.  *See Franks*, 438 U.S. at 155, 171 (defendant is entitled to a hearing only upon a "substantial preliminary showing" of falsity supported by proof).  No doubt, there exists more information about Therabiogen and the Confidential Source than what was included in the Affidavit.  But Messalas gives no reason to suspect that any of it would be relevant to the investigation of crimes relating to other companies like BioCube.  Nor does he offer any reason to think that Special Agent Donohue deliberately or recklessly omitted such information.  Though Messalas may wish to cross-examine Special Agent Donohue about these subjects, a "mere desire to cross-examine" is not enough to earn a hearing under *Franks*.  *See id.* at 171.

### b.  Messalas's Control of BioCube

The Affidavit states that "Messalas owns or controls significantly more than 5% of BioCube's stock" but has not filed the requisite disclosure forms.  (Aff. at ¶ 35.)  It goes on to provide supporting evidence for this claim, including noting that "Messalas told the CW that he

---

[4] In his motion brief, Messalas claimed that an AUSA working on this case had represented to him that "there was no such criminal case." (Suppression Mot. at 22.)  In its opposition brief, the Government denied this and asserted the defense had, "at best," misunderstood its position.  (Gov't Opp'n at 14–15 & n.8.)  It also filed a letter clarifying that it stood by the representations in the Affidavit.  (2/21/2019 Letter (Doc. No. 154-2) at 1.)  In his reply, Messalas appears to accept the Government's position, but he now presses the arguments discussed above.

owns BioCube stock through three separate entities: (i) Admetus Capital; (ii) Alpine Securities; and (iii) Blackwater Capital." (*Id.*) Messalas contends this passage is misleading because he did not secretly control BioCube through Alpine and Blackwater. (Suppression Mot. at 23–24.) Alpine, he claims, is simply an unaffiliated broker-dealer which does not itself own or control stock; and Blackwater, with whom his affiliation is no secret, controlled only convertible debt.

These arguments are premised on a far-too-literal reading of the word "own" as Affidavit plainly meant it. Yes, broker-dealers do not own stock on behalf of their customers[5] and, yes, convertible debt is not an ownership share until it is converted into stock, but these distinctions have no practical meaning in this context. What the Affidavit was attempting to convey, and what Messalas conspicuously does not contest in his briefing, was that Messalas effectively owned and controlled significant shares in BioCube through a brokerage account with Alpine Securities and in the form of convertible debt held by Blackwater. Even were the Court willing to fault the Affidavit for word choice – which it is not – it bears emphasis that this passage merely paraphrases Messalas's conversation with the CW. So, not only is the meaning of the challenged language sufficiently clear, but the Government is not even the source of it. The Court discerns no falsehood or attempt to mislead here.

### c. The CW's Criminal History

The Affidavit discloses that, sometime after 2011, the CW was "charged with wire fraud, after which he pled guilty to wire fraud pursuant to a cooperation agreement" and that "[h]e is currently cooperating in hopes of receiving leniency at sentencing." (Aff. at 32 n.4.) It adds, however, that "[h]e has provided reliable information in the course of this investigation" which

---

[5] *See, e.g.*, *Brokers*, FINRA, https://www.finra.org/investors/brokers (last visited July 12, 2019) ("A broker-dealer is a person or company that is in the business of buying and selling securities . . . on behalf of its customers (as a broker), for its own account (as a dealer), or both.").

has "been corroborated by other evidence." (*Id.*) Messalas objects that this disclaimer omits critical information about the CW's criminal past, including (a) that he was identified in 2013 as an unindicted co-conspirator in a pump-and-dump stock fraud case brought in the Central District of California, and (b) that he was "named in an SEC enforcement action filed in response to a scheme . . . to sell more than 21 billion shares of stock in violation of the registration provisions of the federal securities laws." (Suppression Mot. at 21–22.)

Although this appears to be an omission, it satisfies neither of the *Franks* prongs. First, there is nothing to suggest it is material. To establish probable cause, the Affidavit primarily relies on physical evidence – *i.e.*, recordings of conversations between the CW and the suspected conspirators – and not the CW's say-so. There was therefore no need to expound at length on the CW's credibility. *See Levasseur*, 816 F.2d at 43–44 (holding that failure to include an informant's full history of criminal activity, drug abuse, and psychiatric problems did not require a *Franks* hearing where a large portion of the challenged affidavit relied on other sources to establish probable cause); *United States v. Pecker*, No. 03-CR-1308 (TCP), 2006 WL 8423960, at *3 (E.D.N.Y. Sept. 12, 2006) (collecting similar cases). Second, Messalas points to nothing that would suggest Agent Donohue intentionally or recklessly omitted this information. Viewed in context, the omission of a portion of the CW's history does not, by itself, show anything more than negligence. *See United States v. Long*, 678 F. App'x 31, 34 (2d Cir. 2017) (summary order) (neglecting to include that the confidential informant was "a drug addict" who had been paid $3,000 for help with the investigation does not constitute an intentional falsehood); *United States v. Coreas*, 419 F.3d 151, 154–55 (2d Cir. 2005) (neglecting to include a witness's prior conviction does not constitute an intentional falsehood).

### ii. Necessity

#### a. The SEC's Parallel Investigation

In making the case for the necessity of the wiretap, the Affidavit notes that there was a parallel SEC investigation that, "to date . . . has not provided sufficient information to obtain arrest warrants or even additional email search warrants. This information has been useful but it has been insufficient to show any criminal intent by the targets." (Aff. at ¶ 90.) Separately, it states that issuing subpoenas to suspected conspirators "would not be completely successful" because "they would most likely be uncooperative and invoke their Fifth Amendment privilege." (*Id.* at ¶ 81.) Eliding these two separate claims, Messalas characterizes the Affidavit as "stat[ing] that Grand Jury subpoenas and the SEC's parallel investigation would be unlikely to reveal evidence because members of the conspiracy would likely refuse to answer questions." (Suppression Mot. at 26.) He then argues there is "no specific factual basis" for this assumption, since the SEC has broad investigatory powers and Messalas had cooperated with the SEC in the past, when it was investigating his hedge fund, LeadDog Capital. (*Id.*)

The Court is unpersuaded. First, the Affidavit never even suggested Messalas would not cooperate with the SEC – instead, it explained that the SEC's fact-gathering process had limited capacity to uncover criminal wrongdoing. As the Government correctly points out, it cannot secretively conduct a criminal investigation through the SEC. *See, e.g.*, *United States v. Mahaffy*, 446 F. Supp. 2d 115, 124 (E.D.N.Y. 2006) (noting that Supreme Court precedent suggests that it may be appropriate to reverse a conviction or dismiss an indictment "where the Government has brought a civil action solely to obtain evidence for its criminal prosecution or has failed to advise the defendant in its civil proceeding that it contemplates his criminal prosecution" (quoting *United States v. Kordel*, 397 U.S. 1, 11–12 (1970))). Second, the

Government was not required to rely on its own or the SEC's subpoena power where, as here, it was legitimately concerned that issuing subpoenas would be unproductive and could jeopardize the investigation. *See United States v. Papadakos*, 729 F. App'x 41, 44 (2d Cir.) (summary order) (accepting an affidavit's rejection of "investigative techniques like trash pulls, pole cameras, GPS tracking, grand juries, and interviews based on the officers' belief that they would either be ineffective or risk the investigation's detection"), *cert. denied sub nom. Zografidis v. United States*, 139 S. Ct. 166 (2018); *United States v. Shipp*, 578 F. Supp. 980, 989–90 (S.D.N.Y. 1984) ("The judgment of the agents that subpoenaeing [a witness] before a grand jury would result in a wall of silence even at the risk of contempt accords with common experience. The Court finds that a proper basis existed for a finding, with respect to the initial wiretap order, that normal investigative techniques had failed, were likely to do so, or were too dangerous."). Here again, the Court discerns no inaccuracy or omission.

### b.    The CW's Interactions with Other Co-Conspirators

In the necessity section, the Affidavit explains why the Government will not be able to complete the investigation using the CW as its primary source of information. One reason it offers is CW's mixed success penetrating the conspiracy over the course of his year and a half of recording phone calls:

> While Messalas sometimes references other participants in his financial deals with the CW, the CW is still not fully privy to the workings of the group of co-conspirators, its activities or its membership. Specifically, other than [suspected co-conspirators Dimitrios] Argyros and [Andreas] Karasamanis, Messalas has not introduced the CW to other members of the conspiracy. While Messalas has alluded to the fact that he is operating with co-conspirators, he has not specifically identified which individuals with whom he is dealing who are aware of the conspiracy's fraudulent nature. Furthermore, were the CW to question Messalas in detail regarding this topic, it may make Messalas suspicious that the CW is working at law enforcement's direction.

(Aff. at ¶ 72.)  The Government now admits this passage was incomplete.  The CW had contact

with three other individuals who, in subsequent reauthorization requests, were identified as target

subjects of the investigation:  Jan Chason, Dominick Bianco, and Rodney Liebowitz.  (Gov't

Opp'n at 18.)  More specifically, according to Messalas, the CW had been included on email

communications with, and had personally met, Jan Chason; he had spoken to and corresponded

by email with Dominick Bianco; and he had "met with and consensually recorded phone calls

with" Rodney Liebowitz.  (Suppression Mot. at 24–25.)  In addition, Chason was listed on

BioCube's public filings as an officer, director, and shareholder of the company.  (Reply at 9.)

　　　　Although Messalas has identified an inconsistency, he again has not made a "substantial

showing" of either materiality or disregard for the truth.  Taking materiality first, there is no

evidence that including the omitted information would have weakened the claim of necessity.

*See Salameh*, 158 F.3d at 113 (holding that a hearing is unnecessary if, "after setting aside the

allegedly misleading statements or omissions, the affidavit, nonetheless, presents sufficient

information").  The point the Affidavit makes in this passage is that the CW is unable, for

various reasons, to fully penetrate the conspiracy.  One of those reasons, for example, was that

"individuals involved in securities fraud often compartmentalize aspects of their operations."

(Aff. at ¶ 73.)  Another, the one challenged here, is that Messalas remained guarded with the CW

despite their long history together.  Thus, the CW was "not fully privy to the workings of the

group, . . . its activities or its membership."  (*Id.* at ¶ 72.)  This included having not been

introduced to more than a handful of the larger group of suspected co-conspirators.  Whether, of

the eight suspected co-conspirators the Affidavit disclosed, (*see id.* at ¶¶ 15–23), the CW had

been introduced to two or five makes little difference.  The point is the same:  after a year and a

half, he had been unable to become "fully privy" to the conspiracy and its members.  Especially

viewed in the context of a larger and otherwise thorough necessity section, *see infra* part I.B, this minor oversight cannot be characterized as material. *United States v. Vilar*, No. S305-CR-621 (KMK), 2007 WL 1075041, at \*27 (S.D.N.Y. Apr. 4, 2007) ("[A]n affiant is not required to share all that he or she knows about the investigation in an affidavit in support of a search warrant."); *United States v. King*, 991 F. Supp. 77, 89 (E.D.N.Y. 1998) ("[T]he suggestion that by not referring to some conversations in his affidavit, [the agent's] omissions trigger a *Franks* hearing is rejected." (quoting *United States v. Sanchez-Flores*, No. 94-CR-864 (JFK), 1995 WL 765562, at \*5 (S.D.N.Y. Dec. 29, 1995))).

Nor does Messalas make any showing that this misstatement was "designed to mislead." *See Rajaratnam*, 719 F.3d at 154. If anything, the immateriality of the omitted information suggests there was no dishonest intent. *Cf. Rajaratnam*, 719 F.3d at 154 ("Of course, the 'reckless disregard' aspect of a *Franks* inquiry can sometimes be *inferred* from the omission of critical information in a wiretap application."). To the extent Messalas argues that, after he showed the materiality of the misstatement – which he has not – the burden shifted to the Government to prove its own good faith, the Court disagrees. *Franks* commands the opposite approach: "Where the *defendant* makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment . . . requires that a hearing be held." *Franks*, 438 U.S. at 154 (emphasis added).

### c. Messalas's Text Messages

Finally, in the necessity section, the Special Agent Donohue rejects using a search warrant to retrieve the text messages on Messalas's iPhone, writing, "Based on my training and

experience, cellular phone providers do not store text messages for more than a few days."  (Aff. at ¶ 80.)  Citing to Apple, Inc.'s support website, Messalas points out that iPhone texts are backed up on iCloud, a server maintained by Apple.  (Suppression Mot. at 27; Reply at 12 & n.5.)

Whether or not subpoenaing Messalas's text messages would have proved fruitful, there is nothing here to suggest the Government intentionally lied or was reckless as to the truth. Either Special Agent Donohue did not consider the possibility that Apple backed up text messages or he mistakenly assumed that Apple's policy mirrored that of cell service providers. At most, these would constitute negligence.  Moreover, the law does not require the Government to exhaust every avenue before resorting to electronic surveillance.  *See United States v. Concepcion*, 579 F.3d 214, 218 (2d Cir. 2009) ("[T]he Government is not required to exhaust all conceivable investigative techniques before resorting to electronic surveillance.").

**B.**     **The Two Remaining Alleged Deficiencies in the Affidavit's Necessity Section Do Not Warrant Suppression**

Courts must ensure Title III's necessity requirement has been met, "so that 'wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.'"  *Id.* at 218 (2d Cir. 2009) (quoting *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974)).  As just explained, however, this does not mean that every other investigative technique must first be exhausted.  Instead, all the statute requires is that the application "inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods."  *Kirk Tang Yuk*, 885 F.3d at 78 (quoting *Concepcion*, 579 F.3d at 218).  "What the provision envisions is that the showing be

tested in a practical and commonsense fashion." *Concepcion*, 579 F.3d at 218 (quoting S. Rep. No. 90–1097 (1968), *as reprinted in* 1968 U.S.C.C.A.N. 2112, 2190).

Messalas raises two critiques of the Affidavit's necessity section which, in addition to the foregoing claimed omissions or inaccuracies, he says show that the Affidavit simply failed to establish necessity. The Court disagrees.

First, Messalas points to the portion of the Affidavit that explains why further use of an undercover agent – who had already been introduced to Karasamanis – would not be fruitful. He argues that the Affidavit should have explained why the undercover "could not be introduced to other members of the conspiracy." (Suppression Mot. at 28.) This critique is simply misplaced. The Affidavit addressed this exact point, stating that although the undercover *could* be introduced to other members of the conspiracy, "doing so would not further the investigation and would be unsuccessful given that the [undercover] would have difficulty penetrating the insular inner circle of the co-conspirators, and the [undercover] . . . is unlikely to gain greater access to the group than that which the CW already has." (Aff. at ¶ 75.)

Second, Messalas points to the portion of the Affidavit describing the Government's then-ongoing efforts to review his emails, which it obtained pursuant to a search warrant executed in April 2016. The Affidavit offered two reasons why the email search warrant was unlikely to be a successful alternative to a wiretap: first, that "the results of email search warrants are not received in a timely enough fashion to conduct a proactive investigation," and, second, that "Messalas has not frequently communicated with the CW via email about the scheme." (*Id.* at ¶ 79.) With respect to the first point, the Affidavit explained that the emails were being screened by an "independent person" prior to review because there was a possibility they would contain privileged communications between Messalas and his attorney. (*Id.*)

Messalas takes issue with both of these reasons, arguing that the privilege review could have been conducted more quickly and that whether he and the CW communicated by email or not was immaterial to the purpose of the wiretap, which was to gather information on other members of the conspiracy. (Reply at 14 & n.6.)

This critique is better founded. The Affidavit could have offered more detail, particularly about the privilege review and why it had not been completed in the six months between the execution of the email warrant in April and the wiretap application in October. However, the paucity of information in this passage does little to undermine the Affidavit's otherwise convincing showing of necessity. First, looking just to this passage, the reasoning with respect to Messalas's infrequent use of email was sufficient to show the email search was not likely to be successful. *See Concepcion*, 579 F.3d at 219–20 (reversing the district court's suppression order where the challenged affidavit, although "less than thorough," "was at least minimally adequate to support" the wiretap (internal quotation marks omitted) (citations omitted)). Contrary to Messalas's interpretation, the fact he had not previously communicated by email with the CW was a relevant consideration. The stated objective of the wiretap application was to investigate a conspiracy "led by Chris Messalas." (Aff. at ¶¶ 11, 34.) Messalas believed the CW to be a member of the conspiracy. Thus, how he communicated with the CW was likely to be probative of how he communicated with other co-conspirators.

Second, even though this and some few other parts of the Affidavit fall short of perfection, the Affidavit as a whole easily makes the case for necessity. It lays out, in detail, the possibility of using numerous alternative investigative techniques, including: confidential sources, undercover agents, physical surveillance, search warrants, arrest warrants, witness interviews, subpoenas, trash searches, location data gathering, pen registers, mail cover requests,

criminal database checks, and parallel investigations.  (*Id.* at ¶¶ 71–91.)  For each technique, it explains why contemplated or actual efforts to use it "appear likely to fail to achieve all the goals of this investigation, or are too dangerous to employ."  (*Id.* at ¶ 71.)

In arguing the Affidavit was inadequate, Messalas misses the forest for the trees.  He argues the Affidavit could have disclosed three more of the CW's contacts, could have addressed the possibility of recovering text messages through iCloud, and could have better described the status of the email search it had reason to believe would not be fruitful.  Indeed it could have, but the law, which "str[ikes] a balance between the needs of law enforcement officials [and] the privacy rights of the individual," is not so demanding.  *Concepcion*, 579 F.3d at 218 (internal quotation marks omitted) (quoting *United States v. Miller*, 116 F.3d 641, 663 (2d Cir. 1997)).  All it requires is that the Government "inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods."  *Kirk Tang Yuk*, 885 F.3d at 78.  This is what the Government did.

## C. Messalas's Alternative Argument, that Suppression Is Warranted Because This Was a Securities Fraud Investigation, Also Fails

Title III authorizes wiretaps for the purpose of investigating a specific list of predicate crimes, of which securities fraud is not one.  *See* 18 U.S.C. § 2516(1).  However, anticipating that wiretaps would often uncover evidence of non-predicate crimes, Congress provided rules governing the use and admission of such evidence.  *See* 18 U.S.C. § 2517(1)–(3), (5).  "When an authorized wiretap intercepts 'communications relating to offenses other than those specified in the order of authorization,' 'disclosure or use' of those communications is permissible provided 'a subsequent application . . . made to a judge of competent jurisdiction [demonstrates] the good faith of the original application.'"  *United States v. Goffer*, 721 F.3d 113, 122–23 (2d Cir. 2013)

(first quoting 18 U.S.C. § 2517(5), then quoting *United States v. Marion*, 535 F.2d 697, 700 (2d Cir. 1976)). As the Second Circuit unequivocally stated in *Goffer*, this rule permits disclosure or use of evidence of other offenses so long as the Government's initial wiretap application "forthrightly discloses the probability of intercepting" that evidence. *Id.* at 123. Thus, in *Goffer*, when "Government investigators indicated in the wiretap applications that, in addition to wire fraud, they expected to uncover evidence of securities fraud (which, they expressly noted, is 'not a predicate offense under 18 U.S.C. § 2516')," admission of such evidence was lawful. *Id.*

The Affidavit in this case is substantively identical to the one approved in *Goffer*. Its stated purpose was to investigate wire fraud and money laundering – both Title III predicate offenses. (Aff. at ¶ 6a.) And it disclosed that, "although not predicate offenses, . . . probable cause exists that we will additionally receive information concerning the Target Subjects' participation in securities fraud and conspiring to commit securities fraud." (*Id.* at 3 n.2.)

Seeking to show that the Affidavit was nevertheless made in bad faith, Messalas argues that it "manufactured" the charges of wire fraud and money laundering as a "cover" in order to further what was ultimately an investigation into only securities fraud. (Suppression Mot. at 29–31.) There was plainly no investigation into wire fraud, he contends, because the Affidavit failed "to identify any false statement made to induce anyone to provide money or property." (*Id.* at 30; Reply at 21–22.) As for money laundering, he claims the "sole basis" for that investigation was a series of discussions about the use of offshore accounts, which "were initiated entirely by the CW and none of the alleged co-conspirators appear to have agreed with anyone [else] to engage in a money laundering scheme." (Suppression Mot. at 143.)

The Court is not persuaded by either of these arguments. First, wire fraud can be perpetrated by both affirmative statements or omissions. *See, e.g.*, *United States v. Gotti*, 459

F.3d 296, 330 (2d Cir. 2006).  The gravamen of the Affidavit is that Messalas was orchestrating a scheme to "pump and dump" shares of BioCube – a scheme that is accomplished by *not informing* prospective purchasers that they are buying shares at an artificially inflated price. Messalas's demand for an overt "false statement" is misplaced.

Second, with respect to money laundering, Messalas misreads the Affidavit.  At multiple points, the Affidavit makes clear that discussions regarding the use of offshore accounts involved Messalas, Karasamanis, and Argyros.  (Aff. at ¶¶ 45, 49, 53.)  To give just one example, in one conversation with the CW, Messalas stated "that he had met with Karasamanis regarding setting up offshore accounts."  (*Id.* at ¶ 49.)  To suggest the Affidavit implicates the CW alone is simply wrong.  Moreover, the fact that the Grand Jury voted to indict Messalas, Argyros, and Karasamanis for conspiracy to commit money laundering (and Karasamanis for the underlying offense, as well) further belies Messalas's argument.  (*See* Superseding Indictment (Doc. No. 76) at 23–24.)

In enacting Title III, "Congress did not intend that a suspect be insulated from evidence of one of his illegal activities gathered during the course of a bona fide investigation of another of his illegal activities merely because law enforcement agents are aware of his diversified criminal portfolio."  *United States v. McKinnon*, 721 F.2d 19, 23 (1st Cir. 1983).  It is plain from the Affidavit, and from the record before the Court, that the Government's investigation into all suspected offenses was legitimate and bona fide.  Given this, and having found no reason to depart from the Second Circuit's squarely apposite decision in *Goffer*, the Court concludes the wiretap was lawful under Title III.  Messalas's motion to suppress the fruits of the wiretap is denied.

## II.    Motion to Compel Discovery

In moving to compel discovery, Messalas seeks information on five distinct topics: (1) details regarding the Government's "'taint team' review of Mr. Messalas's email"; (2) information related to why the Government's undercover agent "was not able to advance the investigation by meeting with other alleged co-conspirators"; (3) information "as to why the SEC declined to pursue any case against Mr. Messalas relating to the conduct charged in this case"; (4) information regarding "why the government's investigation of Mr. Messalas in 2010 and 2011 did not result[] [in] any criminal charges"; and (5) "information known to the government at the time of the submission of the Wiretap Affidavit concerning the CW that was not presented to the authorizing district judge."  (Suppression Mot. at 39–40.)

Although Messalas cites to no specific legal authority in support of these discovery requests, it appears that Messalas makes these discovery requests pursuant to Federal Rule of Criminal Procedure 16(a)(1)(E)(i), which provides for production of "papers, documents, data," and other items "material to preparing the defense."  To obtain documents pursuant to Rule 16(a)(1)(E)(i), Messalas must make a prima facie showing that the information sought is material.  *See U.S. v. Maniktala*, 934 F.2d 25, 28 (2d Cir. 1991).  This requires more than "conjecture" that the evidence may be material – Messalas must provide "some indication that the pretrial disclosure of the disputed evidence would . . . enable[ ] [him] significantly to alter the quantum of proof in his favor."  *United States v. Persico*, 447 F. Supp. 2d 213, 218 (E.D.N.Y. 2006) (quoting *Maniktala*, 934 F.2d at 28); *see also U.S. v. Larranga Lopez*, No. 05-CR-665 (SLT), 2006 WL 1307963, at *8 (E.D.N.Y. May 11, 2006) ([Rule 16(a)(1)(E) "does not entitle a criminal defendant to a broad and blind fishing expedition among [items] possessed by the

Government on the chance that something impeaching might turn up." (internal quotation marks omitted) (citing *Jencks v. United States*, 353 U.S. 657, 667 (1957))).

Discussing his first request for information related to the email review, Messalas explains that this information is material not only to the instant *Franks* challenge, but also to "additional motions Mr. Messalas may make regarding the search of his email account." (Suppression Mot. at 39.) Messalas speculates that agents may have "learned facts about the investigation in contravention of the attorney-client privilege" or failed to employ search terms in the review and consequently "conducted a general search of Mr. Messalas's email, in violation of the Fourth Amendment." (*Id.* at 39.) These bases for discovery fail to satisfy Messalas's obligation to make a prima facie showing that discovery related to the email search would be material. Messalas does not point to a single attorney-client privileged email that would raise concern in this case. Similarly, he cites to no authority for the proposition that a general search of his email, had one occurred, would have violated his Fourth Amendment rights. Generally, "courts in this district reviewing challenges to searches of electronically stored information have declined to require any particular protocols such as the use of specific search terms or methodologies." *United States v. Lebovits*, No. 11-CR-134 (SJ), 2012 WL 10181099, at *22 (E.D.N.Y. Nov. 30, 2012), *report and recommendation adopted*, No. 11-CR-134 (SJ), 2014 WL 201495 (E.D.N.Y. Jan. 16, 2014), and *report and recommendation adopted sub nom.*, *United States v. Gutwein*, No. 11-CR-134 (SJ), 2014 WL 201500 (E.D.N.Y. Jan. 16, 2014). Messalas's motion to compel discovery related to the email search, to the extent it is not rooted in supporting his *Franks* challenge, must be denied.

Messalas further argues that the wiretap affidavit included representations about the email review, and thus that discovery related to the email review is material because it would

support his *Franks* challenge seeking to suppress the fruits of the wiretap. Support for his *Franks* challenge is also the sole basis Messalas provides for his second, third, fourth, and fifth discovery requests. In his motion, Messalas argues that the first, second, third, and fifth requests are each "material to the defense" insofar as "all go to issues of Special Agent Donohue's deliberate or reckless disregard of the truth in his representations in the wiretap affidavit." (Reply at 18 n.9.) Similarly, with respect to his fourth request, Messalas explains that information related to why he was not charged in the Government's 2010/2011 investigation may ultimately support the conclusion that the Government failed to disclose in the wiretap affidavit that the Confidential Source was a failed cooperator. (*Id.* at 17–18.)

Messalas cannot seek discovery to support his *Franks* challenge without first making the preliminary showing required to grant a *Franks* hearing. In its decision in *Franks v. Delaware*, the Supreme Court explained that one of the benefits of requiring "a substantial preliminary showing" was that it would "prevent the misuse of a veracity hearing for purposes of discovery." 438 U.S. at 170. Accordingly, discovery requests seeking to support a *Franks* challenge should be denied where a defendant has failed to make the preliminary showing necessary for a *Franks* hearing. For example, in *U.S. v. Harding*, the Court denied the discovery requests of a defendant who had failed to meet the threshold showing required by *Franks*, explaining that the defendant "is not entitled to wide-ranging discovery to canvass for evidence in support of his motion to suppress." 273 F. Supp. 2d 411, 430 (S.D.N.Y. 2003); *cf. U.S. v. Koschtschuk*, No. 09-CR-0096 (S)(M), 2011 WL 1549464, at *1–2 (W.D.N.Y. Apr. 22, 2011) (explaining that defendants may be entitled to discovery of information related to a *Franks* hearing "upon their threshold showing in support of their claim[] . . . for a *Franks* hearing"); *U.S. v. Espinoza-Romero*, No. 14-CR-144 (CMA), 2016 WL 11642376, at *6 (D. Colo. Jan. 28, 2016) ("Ordering discovery on the basis of

Defendant's speculation that additional information in the Government's surveillance files might possibly be helpful to a subsequent wiretap challenge would defeat . . . the purpose of the 'substantial preliminary showing' required by *Franks* . . . ."); *U.S. v. Roybal*, 46 F. Supp. 3d 1127, 1162 (D.N.M. 2014) (explaining that "allowing the Defendants to obtain this evidence to mount a *Franks* challenge without making the requisite preliminary showing would vitiate the purpose of *Franks*" and noting that the Court "could not find . . . a case in which a court has granted such a request"). The requirement for a preliminary showing under *Franks* was designed to prevent wide-ranging discovery requests precisely like those presented here. Because Messalas has not made the preliminary showing required for a hearing under *Franks*, his motion to compel discovery must be denied.[6]

### III. Motion to Compel the Return of Electronic Devices

Messalas also separately moved pursuant to Federal Rule of Criminal Procedure 41(g) to compel the Government to return electronic devices seized in the search of his home. (Mot. to Suppress at 38.) The Government subsequently returned all electronic devices seized in the search, except for Messalas's iPhone. (Gov't Opp'n at 43.) In his reply, Messalas states that the Government "has refused to confirm or deny whether it has retained images of the electronic

---

[6] Even if Messalas were entitled to discovery to support his preliminary showing under *Franks*, he does not make the prima facie showing required by Rule 16(a)(1)(E)(i) for any of his discovery requests. Regarding at least his first, second, third, and fifth discovery requests, Messalas explains these requests would support his *Franks* motion by providing "circumstantial evidence . . . about Special Agent Donohue's state of mind" sufficient to show "deliberate or reckless disregard of the truth" under *Franks*. (Reply at 18 n.9.) Yet, to be entitled to a *Franks* hearing, a defendant must not only make a preliminary showing of deliberate or reckless disregard for the truth, but also that "the alleged falsehoods or omissions were necessary to the judge's probable cause [or necessity] finding[s]." *Salameh*, 152 F.3d at 113 (citing *Levasseur*, 816 F.2d at 43). As outlined in this Order, the few omissions and inaccuracies defendant has identified in the wiretap affidavit were not material to the required probable cause or necessity findings. Therefore, even if these discovery requests produced the evidence Messalas expects relating to Agent Donohue's state of mind, Messalas provides no reason to conclude that they would provide evidence of omissions and inaccuracies necessary to the probable cause or necessity findings. Accordingly, Messalas fails to explain how these discovery requests would provide information that would "significantly . . . alter the quantum of proof in his favor" on his motion for a *Franks* hearing. *Persico*, 447 F. Supp. 2d at 218 (quoting *Maniktala*, 934 F.2d at 28).

devices" it has returned and, accordingly, Messalas "renews his Rule 41(g) motion and asks the Court for an order directing the government to delete the images."  (Reply at 19 n.10.)

To the extent Messalas seeks the return of his iPhone, the Court denies this request.  The Government has more than adequately justified its retention of the iPhone on the basis that it plans to introduce the phone as evidence at trial and the data on the phone cannot be exactly copied.  (Gov't Opp'n at 44.)  The Court also denies Messalas's Rule 41(g) motion to direct the Government to delete any electronic images of previously seized electronic devices.  Messalas provides no basis for this request, (*see* Reply at 19 n.10), and the Government has already agreed not to introduce evidence from the seized devices at trial.  (Gov't Opp'n at 43.)

## CONCLUSION

For the reasons set forth above, the motions addressed herein are denied in their entirety.

SO ORDERED.

Dated:  Brooklyn, New York
           April 4, 2020

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
Chief United States District Judge