UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------X
UNITED STATES OF AMERICA,

       - against -                                                 **MEMORANDUM & ORDER**
                                                                      17-CR-339 (RRM)

CHRIS MESSALAS,

                Defendant.
--------------------------------------------------X
ROSLYNN R. MAUSKOPF, Chief United States District Judge.

      On June 28, 2017, defendant Chris Messalas was indicted and charged with conspiracy to commit securities fraud and conspiracy to commit money laundering in violation of 15 U.S.C. § 78j and 18 U.S.C. §§ 371, 1956. Before the Court is Messalas's motion to suppress the fruits of a search of his home pursuant to a warrant. On November 7, 2019, and November 14, 2019, the Court held an evidentiary hearing relating to the home search. For the reasons set forth below, Messalas's motion is denied.

BACKGROUND

      On April 10, 2017, the Honorable Cheryl L. Pollak issued a warrant for Messalas's arrest. (Arrest Warrant, Ex. E1 to Gov't Opp'n (Doc. No. 149-5) at 2–3.)[1] On April 13, 2017, Judge Pollak issued a warrant for the search of Messalas's home. (Search Warrant, Ex. F1 to Gov't Opp'n (Doc. No. 149-6) at 2–8.) The search warrant required that the search be executed "[i]n the daytime 6:00 a.m. to 10:00 p.m." (Search Warrant at 2.) Attachment A to the warrant stated that the "property to be searched is 20 Carlton Place, Staten Island, New York." (*Id.* at 3.) Attachment B to the warrant outlined the property to be seized in the search, which included

---

[1] With the exception of hearing testimony, page numbers correspond to pagination assigned by the Court's Electronic Case Filing system.

"[a]ll records relating to" violations of securities fraud, wire fraud, and money laundering statutes; "[r]ecords and information" relating to specified companies and entities; "[r]ecords relating to communications with co-conspirators"; and "any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant." (*Id.* at 4–5.)

On the morning of April 14, 2017, agents from the Federal Bureau of Investigation ("FBI") executed the arrest and search warrants at Messalas's home.  Pursuant to the warrants, the agents arrested Messalas and seized paper documents and electronic devices found in his home.

On November 28, 2018, Messalas filed the instant motion to suppress the evidence seized from his home pursuant to the search warrant.[2]  (Notice of Motion to Suppress (Doc. No. 142).) Messalas first argues that suppression is warranted because the search warrant was insufficiently particularized.  (Memorandum in Support of Motion to Suppress ("Suppression Mot.") (Doc. No. 143) at 32–34.)  Second, Messalas argues that agents exceeded the scope of the warrant by seizing documents not authorized by the search warrant.  (Suppression Mot. at 34–36.)  Finally, Messalas argues that agents executed the warrant before 6:00 a.m., in violation of the terms of the warrant and Federal Rule of Criminal Procedure 41.  (*Id.* at 36 n.10.)

On November 7 and 14, 2019, the Court held a hearing for the parties to present evidence on whether agents exceeded the scope of the warrant either by seizing documents unresponsive to the warrant or by entering Messalas's home before 6:00 a.m.  (*See* Minute Entry of 11/7/2019; Minute Entry of 11/14/2019; *see also* Order of 7/8/2019.)  On November 7, FBI Special Agent

---

[2] In that motion, Messalas also sought to suppress the fruits of a wiretap, to compel discovery of certain documents, and to compel the return of certain electronic devices seized in the search of his home.  In an order issued on April 4, 2020, the Court denied these portions of Messalas's motion.  (Order of 4/4/2020 (Doc. No. 211) at 1.)

Jonathon Luca and Danielle Mongelli, Messalas's wife, testified regarding the search. (*See* Minute Entry of 11/7/2019; Testimony of Agent Luca ("Luca"); Testimony of Danielle Mongelli ("Mongelli").) Mongelli's testimony continued on November 14, followed by testimony from FBI photographer Chelsea Grady and FBI Special Agent Christopher Donohue. (*See* Minute Entry of 11/14/2019; Testimony of Chelsea Grady ("Grady"); Testimony of Christopher Donohue ("Donohue").)

## I. Credibility of the Witnesses

Based on the testimony and evidence presented at the hearing, the Court finds the testimony of the three FBI witnesses to be credible. These witnesses provided testimony that was logical, internally consistent, consistent with one another, and substantially corroborated by contemporaneous documentary evidence. The agents' consistent testimony about the FBI's preparations the morning of the search, including the times the search team arrived and departed from a Walgreens parking lot near Messalas's home, (Luca at 15–16; Grady at 174), is corroborated by the FBI operations order, which called for agents to gather at a Walgreens parking lot near Messalas's house at 5:30 a.m. and to depart for Messalas's residence at 5:55 a.m. (*See* Gov't Ex. 7.) All three FBI witnesses' testimony that agents executed the warrant after 6 a.m., (Luca at 20–21, 37; Grady at 174; Donohue at 184), is corroborated by FBI Form 302s completed after the arrest and search, which report that the arrest took place at approximately 6:00 a.m. and that the search began at approximately 6:15 a.m. (*See* Gov't Exs. 3500-JL-01, 3550-JL-02.) Finally, the FBI witnesses' testimony regarding the timeline of events is further corroborated by emails sent by Agent Donohue on the morning of the search that suggest Messalas was arrested shortly after 6:00 a.m. and that Agent Donohue left with Messalas for 26 Federal Plaza sometime around 6:30 a.m., as well as by a photograph of Agent Donohue's

3

phone calling Messalas's phone taken prior to Agent Donohue's departure. (*See* Gov't Ex. 4; Def. Ex. 10-A.)

The Court finds Mongelli's contrary testimony regarding the day of the search unreliable at best – and, indeed, largely implausible. Mongelli's recollection of the time at which agents entered her home is based on a single observation of the clock on her cable box the moment after Mongelli was awoken from "a sleep-like state" with the belief that her "house was broken into" because she heard her husband shouting. (Mongelli at 96–97.) The attendant fear and confusion of this moment provides a substantial reason to doubt the reliability of Mongelli's recollection of the time displayed on the clock. Moreover, Mongelli's explanation for why she looked at the clock on her cable box in this moment of panic strains credulity. Recalling the day of the search, Mongelli testified, "I know why I looked at the clock. . . . We would not be robbed if it was after six a.m." (Mongelli at 143.)

The credibility of Mongelli's testimony is further called into question by the fact that her specific recollection of the time has changed during the pendency of this motion. In Mongelli's sworn declaration accompanying Messalas's suppression motion, Mongelli stated that she "was awakened at 5:20 a.m. by [her] husband shouting [her] name." (Declaration of Danielle Mongelli ("Mongelli Decl.") (Doc. No. 145) ¶ 2.) In her testimony at the hearing, however, Mongelli reported a specific recollection that the clock read "5:18." (Mongelli at 139.) Although Mongelli attributes this discrepancy to the fact that she "rounded [the time] up" in her affidavit, it is unclear why Mongelli would have felt it appropriate or necessary to "round up" this important fact. (*Id.* at 143.) Moreover, as the government notes and as the Court finds, Mongelli made "hyperbolic claims about the agents' conduct that defy common sense and render the entirety of her testimony incredible." (Letter Regarding Suppression Hearing ("Gov't Post-

4

Hearing Brief") (Doc. No. 219) at 9). For example, she claimed that the agents handcuffed Messalas to a glass door, and her explanation of that event was both vague and incredible. (*Id*. at 7-9.) Mongelli's apparent willingness to make imprecise and changing sworn statements, as well as to embellish in ways wholly implausible, casts substantial doubt on the reliability of her testimony, particularly given the fact that these statements redound to the benefit of her husband. (*Id.* at 143.)

II.     **Findings of Fact**

Based on the evidence presented at the hearing, the Court makes the following findings of fact.

The day before the search of Messalas's home, there was a pre-operation briefing for the FBI team that would be participating in the arrest of Messalas and the search of his home. (Luca at 8.) During the briefing, a document called an "operations order" was circulated among the team. (*Id.* at 9–10; *see* Gov't Ex. 7.) The operations order described the FBI arrest and search teams' plan to gather at a Walgreens parking lot at 955 Manor Road, Staten Island, at 5:30 a.m. before departing for Messalas's home at 5:55 a.m. (Luca at 11–12.) The team would then knock and announce at Messalas's home at 6:00 a.m., inform Messalas of the charges against him, and arrest him. (*Id.* at 12.)

The search team in fact gathered at the Walgreens parking lot at 5:30 a.m. on the morning of April 14, 2017. (Luca at 15–16; Grady at 174.) There, the team had a second pre-operation briefing that lasted about 10 to 15 minutes. (Luca at 17.) After the briefing, sometime around 5:50 to 5:55 a.m., the team left the Walgreens parking lot for Messalas's residence. (*Id.* at 18; Grady at 174.)

5

As all three agents testified, agents either arrived at the Messalas residence or knocked on Messalas's door at or after 6:00 a.m. (Luca at 20–21, 37; Grady at 174; Donohue at 184.) Messalas answered the door and was taken into custody immediately. (Luca at 48; Donohue at 190.) Agents entered Messalas's home after 6:00 a.m. (Luca at 37; Grady at 174.) In an email to FBI agents coordinating the arrests of Messalas's alleged co-conspirators sent at 6:08 a.m. on the day of the search, Agent Donohue wrote, "Messalas in custody." (Gov't Ex. 4; Luca at 29–31.) That email was preceded and followed by additional emails from other agents confirming the arrest of Messalas's alleged co-conspirators around the same time. (Gov't Ex. 4; Luca at 30–32.) FBI Form 302s regarding the arrest and search reflect that Messalas was arrested at approximately 6:00 a.m. and that the search began at approximately 6:15 a.m. (*See* Gov't Exs. 3500-JL-01, 3500-JL-02.)

Following Messalas's arrest, Agent Donohue remained with Messalas while agents conducted a security sweep of the home. (Luca at 21–22.) During this sweep, agents entered the room in which Mongelli had been sleeping and asked her to come with them. (Luca at 22–23, 54.) After the security sweep, photographers entered to take pre-search photographs of the house. (*Id.* at 23–24.) Agents identified Messalas's cell phone in plain view and the phone was photographed. (*Id.* at 27; Gov't Ex. 1-003.) Agent Donohue called Messalas's phone at 6:24 a.m. while Agent Donohue was still in Messalas's home. (Donohue at 208–09; *see also* Def. Ex. 10-A.) A photograph was taken of the ringing phone displaying Agent Donohue's phone number and was recorded as the third photograph in the FBI's photo log for the day of the search. (Grady at 169–72; Def. Ex. 8 (photo log); Def. Ex. 10-A (photo of phone ringing).)

Agent Donohue made the 6:24 a.m. call near the end of his time at Messalas's home. (Donohue at 210.) By 6:35 a.m., Agent Donohue was driving to 26 Federal Plaza with Messalas

6

in custody. (*Id.* at 205; *see also* Luca at 32, 78–79.) Agent Donohue sent an email at 6:35 a.m. to other FBI agents reading, "On our way." (Gov't Ex. 4; Luca at 32.) The agent who was driving Agent Donohue and Messalas to 26 Federal Plaza took the Verrazano Bridge, but then took a wrong turn onto the Belt Parkway; they subsequently exited, drove back to the Brooklyn-Queens Expressway, and arrived in Manhattan either through the Hugh L. Carey Tunnel or over the Brooklyn Bridge. (Donohue at 211–12.) The wrong turn added five to ten minutes to the drive. (*Id.* at 212.) Because it was Good Friday, traffic was lighter than would otherwise have been expected. (*Id.* at 217.) Upon pulling up to 26 Federal Plaza, another agent met Agent Donohue and Messalas, whereupon Agent Donohue and Messalas got out of the car and went directly to an interview room. (*Id.* at 217–18.) Agent Donohue began a recorded interview of Messalas at 7:12 a.m. (*Id.* at 213–14; *see also* Def. Ex. 2.)

Back at the Messalas residence, after initial entry photos were taken and the items in the house were documented, the FBI search team began to search the house. (Luca at 35.) The search team determined what documents to seize based on their prior knowledge of the case from working on the wiretap and by reviewing documents in light of the search warrant's guidelines to determine whether they were within the scope of the warrant. (*Id.* 38–39.) To assist in this process, the search warrant was placed on Messalas's dining room table toward the beginning of the search of Messalas's home. (*Id.* at 33–34; Gov't Ex. 1-016.) Agents referred to the search warrant while conducting the search. (Luca at 35.) Agent Luca personally consulted the warrant on at least one occasion to determine whether a drawer containing securities-related documents fell within the warrant's scope, but determined that the documents were outside the scope of the warrant and did not seize them. (*Id.* at 36.) After the search was complete, FBI photographers took photos of the home, a log of items seized as evidence was prepared, and a receipt for the

7

items seized was left at Messalas's home. (Luca at 39–40; 3500-JL-2E (evidence log); 3500-JL-2C (receipt).)

### III. Post-Hearing Briefs

On June 5, 2020, the parties filed post-hearing briefs regarding the motion to suppress the fruits of the home search. (Post-Hearing Brief on Behalf of Chris Messalas ("Def. Post-Hearing Brief") (Doc. No. 220); Letter Regarding Suppression Hearing ("Gov't Post-Hearing Brief") (Doc. No. 219).)

Messalas first argues that it is the Government's burden to establish that it did not violate the terms of the search warrant, and in light of the competing evidence as to time of entry, Mongelli's testimony that agents entered her home at 5:18 a.m. warrants suppression. (Def. Post-Hearing Brief at 13, 17.) Messalas emphasizes not only Mongelli's specific memory of the time of entry, but also the fact that Mongelli and Agent Donohue both testified that it was dark when agents entered the home. (*Id.* at 17–18.) According to Messalas, photographs taken on April 14, 2019 – exactly two years after the search – show that it is not dark outside Messalas's home at 6:00 a.m. (*Id.* at 18.) Messalas discounts Agents Donohue and Luca's contrary accounts of the time of entry, arguing that they both testified "based on general practice," and not specific recollections of the search. (*Id.* at 11, 18–19.)

Messalas also relies on the timeline of Agent Donohue's transport of Messalas to 26 Federal Plaza to argue that agents entered the home before 6:00 a.m. (Def. Post-Hearing Brief at 22.) Messalas argues that agents could not have completed all the tasks the testimony shows were completed between the agents' entry into the home and Agent Donohue's purported departure 20 to 30 minutes later. (*Id.* at 22–23.) Instead, Messalas contends, Agent Donohue left with Messalas at approximately 6:15 a.m., approximately one hour after entering the home at

8

5:18 a.m., as reported by Danielle Mongelli.  (*Id.* at 25.)  According to Messalas, this timeline is further supported by the fact that it is implausible that Agent Donohue could have left Messalas's home around 6:30 a.m. and have arrived at 26 Federal Plaza and started an interview with Messalas by 7:12 a.m.  (*Id.* at 23–24.)  Given the substantial evidence that agents entered the home before 6:00 a.m., Messalas argues, the search violated the Fourth Amendment and Federal Rule of Criminal Procedure 41 and suppression is warranted.  (*Id.* at 26–27.)

Finally, Messalas argues that the search of his home was overbroad.  (Def. Post-Hearing Brief at 27.)  In support of this claim, Messalas cites particular items seized by the agents that he claims fell outside the scope of the search warrant because they predated the time limitation on the warrant or were not responsive to the warrant's subject matter.  (*Id.* at 28.)

In response, the Government notes that it presented testimony from three FBI witnesses supporting the conclusion that the time of entry was at or after 6:00 a.m., that the witnesses' testimony was factually consistent with one another, and that the witnesses' testimony was independently corroborated by other documents.  (Gov't Post-Hearing Brief at 5.)  In contrast, the Government argues, aspects of Mongelli's testimony were inconsistent, "facially incredible," and contradicted by evidence introduced at the hearing.  (*Id.* at 6–7.)  The Government also notes instances where it argues Mongelli engaged in "hyperbole," calling the credibility of the rest of her testimony into question.  (*Id.* at 7–9.)  Finally, the Government argues that even if the Court finds that FBI agents entered the home prior to 6:00 a.m., that would not, on its own, justify suppression.  (*Id.* at 10.)

## CONCLUSIONS OF LAW

The Fourth Amendment "expressly imposes two requirements" with respect to searches and seizures: "First, all searches and seizures must be reasonable.  Second, a warrant may not be

9

issued unless probable cause is properly established and the scope of the authorized search is set out with particularity." *Kentucky v. King*, 563 U.S. 452, 459 (2011) (citing *Payton v. New York*, 445 U.S. 573, 584 (1980)).

Messalas's motion implicates both of these requirements. Beginning with the warrant, Messalas argues it was insufficiently particularized in describing the property to be seized, and that therefore everything that grew out of the search, including Messalas's written consent to the search of his cell phone, should be suppressed. (Suppression Mot. at 32–34; 2019

Memorandum in Further Support of Chris Messalas's Motion to Suppress ("Reply") (Doc. No. 154) at 19.) With respect to the search itself, Messalas contends that he is entitled to blanket suppression because the search was an unreasonable "general search" conducted in violation of the Fourth Amendment, (Suppression Mot. at 34–36; Reply at 20–21), and because agents commenced the search before 6:00 a.m. in deliberate disregard of the terms of the warrant and Federal Rule of Criminal Procedure 41. (Suppression Mot. at 36 n.10.)

For the reasons that follow, defendant's motion fails.

**I.    Suppression Based on the Particularity of the Warrant**

As the Second Circuit has explained,

> The particularity requirement has three components. First, a warrant must identify the specific offense for which the police have established probable cause. Second, a warrant must describe the place to be searched. Third, the warrant must specify the items to be seized by their relation to designated crimes. [A]n otherwise unobjectionable description of the objects to be seized is defective if it is broader than can be justified by the probable cause upon which the warrant is based.

*United States v. Galpin*, 720 F.3d 436, 445–46 (2d Cir. 2013) (internal quotation marks omitted) (citations omitted). These restrictions exist to bind the discretion of the officers executing the warrant and ensure "that the permitted invasion of a suspect's privacy and property are no more than absolutely necessary." *United States v. George*, 975 F.2d 72, 76 (2d Cir. 1992). However,

10

the particularity requirement is not usually interpreted to mean the officers must be left with no discretion whatsoever.  *See Galpin*, 720 F.3d at 446; *United States v. Young*, 745 F.2d 733, 759 (2d Cir. 1984).  Rather, the warrant must be "sufficiently specific to permit the rational exercise of judgment . . . in selecting what items to seize."  *United States v. Dupree*, 781 F. Supp. 2d 115, 150 (E.D.N.Y. 2011) (quoting *United States v. Regan*, 706 F. Supp. 1102, 1110 (S.D.N.Y. 1989)); *see also United States v. Shi Yan Liu*, 239 F.3d 138, 140 (2d Cir. 2000).  "[C]ourts may tolerate some ambiguity in the warrant so long as 'law enforcement agents have done the best that could reasonably be expected under the circumstances, have acquired all the descriptive facts which a reasonable investigation could be expected to cover, and have insured that all those facts were included in the warrant.'"  *Galpin*, 720 F.3d at 446 (quoting *Young*, 745 F.2d at 759).

With these considerations in mind, courts in this Circuit have routinely upheld warrants that define the items to be seized by "reference to particular offenses and the use of an illustrative list."  *United States v. Jacobson*, 4 F. Supp. 3d 515, 524 (E.D.N.Y. 2014) (authorizing seizure of "evidence, fruits and instrumentalities" of particular crimes, and "enumerat[ing] ten illustrative categories of items"); *see also United States v. Riley*, 906 F.2d 841, 843 (2d Cir. 1990) (authorizing seizure of "bank records, brokerage house records, business records, . . . and other items that constitute evidence" of a conspiracy to distribute cocaine); *United States v. Lustyik*, 57 F. Supp. 3d 213, 227–28 (S.D.N.Y. 2014) (authorizing seizure of "evidence, fruits, or instrumentalities" of specific crimes, and setting "forth an illustrative list of items to be seized").  When general categories of items are listed without reference to a particular crime, or when a crime is given but the items to be seized are not specified, the particularity requirement is often not met.  *See United States v. Buck*, 813 F.2d 588, 590–92 (2d Cir. 1987) (finding insufficient particularity where the warrant "described the crimes" but "gave no limitation whatsoever on the

11

kind of evidence sought"); *United States v. Wey*, 256 F. Supp. 3d 355, 385 (S.D.N.Y. 2017) (finding insufficient particularity where the warrant "crucially" supplied no "linkage to the suspected criminal activity, or indeed any meaningful content-based parameter").

Here, the search warrant satisfied all three of the *Galpin* factors and provided the executing agents more than enough information to "permit the rational exercise of judgment" in deciding what to seize. *Dupree*, 781 F. Supp. 2d at 150. Attachment A to the warrant specified the place to be searched: Messalas's home. (Search Warrant at 3.) Attachment B then imposed multiple constraints on the items to be seized: it permitted seizure of (1) "records" (2) relating to securities fraud, wire fraud, and money laundering, and conspiracy to do the same (3) committed by only Messalas and four named co-conspirators (4) after June 1, 2011. (*Id.* at 4.) To this, it added an illustrative list of the types of "records" sought: "stock certificates, bank account statements, tax filings, incorporation documents, contracts, agreements, or communications." (*Id.*) The warrant limited the search further, specifying that records of this sort were to be seized only if they "relat[ed] to" a list of fourteen companies linked to Messalas. (*Id.* at 4–5.) Thus, the agents searching Messalas's home were authorized to seize "records" that evidenced six crimes committed by five people within a six-year period and that likely related to fourteen companies. This is more than enough to satisfy the Fourth Amendment. *See Riley*, 906 F.2d at 843; *Lustyik*, 57 F. Supp. 3d at 227–28; *Jacobson*, 4 F. Supp. 3d at 524.

In arguing to the contrary, Messalas relies almost exclusively on Judge Nathan's order in *Wey*. (Suppression Mot. at 33–34.)[3] *Wey*, however, is inapposite. The challenged warrants

---

[3] Messalas also argues that some of the companies included in the illustrative list, including MasterBeat and Synergetics, "have no relationship to this case and there was no basis in the warrant affidavit to believe that there was probable cause as to those entities." (Reply at 19 n.1; *see also* Suppression Mot. at 28.) The significance of this argument is unclear. If Messalas is arguing that, separate from any particularity issues, this portion of the warrant was "overbroad" and not supported by probable cause, the Court disagrees. The affidavit in support of the warrant identifies discussions about "other securities fraud schemes" in which "Messalas has referred . . . to stocks of companies including Masterbeat ('MSTO'), Synergetics ('SYNG')" and others. (Search Warrant Aff., Ex. F2 to

12

there "fail[ed] to set forth the crimes under investigation . . . [or] in any way describe any suspected criminal conduct," failed to describe the items subject to seizure by meaningful reference to the persons or entities to which they should relate, and "fail[ed] to limit the items subject to seizure by reference to any relevant timeframe or dates of interest." *Wey*, 256 F. Supp. 3d at 384–88. In all the ways those warrants fell short, the warrant here did not. The search warrant for Messalas's residence was particularized and "sufficiently specific" to permit the executing agents to exercise judgment "in selecting what items to seize." *Dupree*, 781 F. Supp. 2d at 150. Messalas is not entitled to suppression based on the particularity of the warrant.

## II.     Suppression Based on an Overbroad Search

Even though a search may be authorized by a warrant, it must also be conducted in a reasonable manner. *See* U.S. CONST. amend. IV; *United States v. Ganais*, 824 F.3d 199, 209–10 (2d Cir. 2016) (en banc) ("[B]oth the scope of a seizure permitted by a warrant, and the reasonableness of government conduct in executing a valid warrant, can present Fourth Amendment issues." (citations omitted)). When it is not, "the normal remedy is suppression and return" of the items improperly seized, "not invalidation of the entire search." *United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988). The "drastic remedy" of blanket suppression – what Messalas seeks here – is reserved for situations where "those executing the warrant acted in flagrant disregard of the warrant's terms." *Id.* (citation omitted) (internal quotation marks omitted).

"Government agents 'flagrantly disregard' the terms of a warrant so that wholesale suppression is required only when (1) they effect a 'widespread seizure of items that were not

---

Gov't Opp'n (Doc. No. 149-6) at 56–72.) If, instead, Messalas is arguing that the inclusion of these companies is evidence of the warrant's lack of particularity, this argument is belied by the fact that there *was* probable cause to believe the crimes under investigation related to these companies.

13

within the scope of the warrant,' and (2) do not act in good faith." *Shi Yan Liu*, 239 F.3d at 140 (quoting *Matias*, 836 F.2d at 748) (citing *Marvin v. United States*, 732 F.2d 669, 675 (8th Cir. 1984)). To satisfy the first prong, the search must resemble a "general search." *Id.* at 141. "[W]hat the Framers of the Fourth Amendment most strongly opposed . . . were general searches." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 669 (1995) (O'Connor, J., dissenting). "Such searches—which have been variously described as 'wide-ranging exploratory searches,' and 'indiscriminate rummaging[s]—are especially pernicious, and 'have long been deemed to violate fundamental rights.'" *Shi Yan Liu*, 239 F.3d at 140 (alteration in original) (citations omitted). To satisfy the second prong, "the search must resemble a general search in the sense that it—like a general search—is not conducted in good faith." *Id.* at 141 n.3.

It bears emphasis that blanket suppression is only appropriate "in the most extraordinary of cases." *United States v. Pinto-Thomaz*, 357 F. Supp. 3d 324, 331 (S.D.N.Y. 2019) (quoting *Shi Yan Liu*, 239 F.3d at 142). Even if a court determines the Government flagrantly disregarded the terms of the warrant, it should only grant blanket suppression after weighing the deterrent benefit of that remedy against the costs of suppressing valuable evidence. *Id.* (citing *United States v. Ganais*, 755 F.3d 125, 136 (2d Cir. 2014), *rev'd on reh'g en banc on other grounds*, 824 F.3d 199 (2d Cir. 2016)).

The Court finds no basis for concluding that FBI agents "flagrantly disregard[ed]" the warrant in conducting the search of Messalas's home. *Shi Yan Liu*, 239 F.3d at 140. In support of his argument that the search was overbroad, Messalas identifies a small number of specific documents that he claims fell outside the terms of the search warrant. (Def. Post-Hearing Brief at 28.) However, Messalas fails to establish that these individual documents were not properly seized as part of larger collections of documents responsive to the warrant. Agent Luca testified

14

that when a notebook or folder contains a page with information responsive to a search warrant, he "would consider [it] destruction of evidence" to remove just the responsive page, and would instead seize the entire notebook or folder.  (Luca at 82–83.)  Messalas does not challenge the legality of this practice and fails to establish that the documents he identifies were not properly seized according to this practice.

Messalas also points to the fact that agents seized documents from a desk after Mongelli told them that the documents on the desk belonged to her alone.  (Def. Post-Hearing Brief at 29; Mongelli at 123.)  Yet, as Agent Luca explained at the hearing, FBI agents conducting a search could not be expected to rely on homeowners to accurately and honestly identify documents responsive to a search warrant – instead, the agents must examine the documents and make the determination themselves.  (Luca at 39.)  Furthermore, Agent Luca's testimony supports the conclusion that agents engaged in precisely this sort of careful review during their search of Messalas's home.  Not only were the attachments to the search warrant placed on a table in Messalas's home for agents conducting the search to review, but Agent Luca personally consulted the warrant during the search, determined based on the warrant that a drawer full of "securities-related materials" fell outside its scope, and left the documents where they were.  (*Id.* at 35–36.)

Messalas put forth no other evidence at the hearing to establish that Agent Luca or the other FBI agents disregarded the warrant in conducting the search.  Although Mongelli described her home as having been "ransacked" in her declaration, (Mongelli Decl. ¶ 18), she walked back this description during the hearing, stating that she "did not want anybody to give a false impression that anybody destroyed anything in [her] home." (Mongelli at 122.)  Instead, Mongelli testified that she "felt that everything, every room, everything was gone through." (*Id.*)

15

A thorough search of Messalas's home does not on its own violate the terms of the warrant. Mongelli's testimony thus does not provide evidence of a "widespread seizure of items" outside the scope of the warrant that would justify suppression here. *Shi Yan Liu*, 239 F.3d at 140.

Finally, Messalas points to documents he has received in discovery as evidence in support of his motion. Specifically, he claims that "more than 40% of the hard copy documents seized by the agents contain nothing responsive to the warrant" and "no mention of any of the individuals or entities listed in Attachment B." (Reply at 20; Def. Supplemental Letter (Doc. No. 166) at 2.) These documents include, he says, "mortgage statements for the family home, bank statements of entities referenced nowhere in the warrant . . . [his personal] credit card bill, and various notes about music streaming services." (Reply at 20.)

Even assuming that Messalas's claim is correct, the Court is aware of no authority for ordering suppression on this basis alone, in the absence of additional evidence that the search was unreasonable. To the contrary, courts in this district have rejected claims for suppression on this basis so long as a majority of the documents seized were within the warrant's scope and the search was otherwise executed in a reasonable fashion. *See Dupree*, 781 F. Supp. 2d at 156–57 ("[E]ven if some of these documents were outside the scope of the warrant, they do not outnumber the documents described in the warrant."); *In re Application of Madison*, 687 F. Supp. 2d 103, 116 (E.D.N.Y. 2009) ("Nevertheless, the majority of the items . . . were authorized for seizure under one of the categories [in the warrant] . . . . To the extent any of these items lack evidentiary value, such is not a basis for rendering the entire search, or even the individual seizures, illegal."). Based on the evidence presented, the Court finds that the agents conducting the search of Messalas's home did not "act[] in flagrant disregard of the warrant's terms."

16

*Matias*, 836 F.2d at 747. Messalas is not entitled to suppression based on the scope of the search.

### III. Suppression Based on Time of Entry

As discussed above, searches pursuant to a warrant must be conducted consistent with the terms of the warrant and in a reasonable manner. *See* U.S. CONST. amend. IV; *Ganais*, 824 F.3d at 209–10. Courts have long recognized that the time a search is executed bears on its reasonableness, as "intrusion into an occupied home in the middle of the night is plainly a greater invasion of privacy than entry during the day." *United States v. Smith*, 340 F. Supp. 1023, 1029 (D. Conn. 1972). This concern about nighttime entry finds expression in Federal Rule of Criminal Procedure 41(e)(2)(A)(ii), which requires that search warrants command that agents "execute the warrant during the daytime, unless the judge for good cause expressly authorizes execution at another time."

Here, the search warrant for Messalas's residence required that the warrant be executed "[i]n the daytime 6:00 a.m. to 10:00 p.m." (Search Warrant at 2.) Messalas argues that suppression is warranted because agents executed the warrant before 6:00 a.m., in violation of the terms of the warrant and Federal Rule of Criminal Procedure 41. (Suppression Mot. at 36 n.10.) The parties disagree as to whether suppression would be warranted if Messalas were able to establish that agents executed the search warrant prior to 6:00 a.m. (Gov't Post-Hearing Brief at 10; Def. Post-Hearing Brief at 26.) However, the Court need not resolve this dispute. As noted in its findings of fact above, the Court concludes based on the credible testimony of the three FBI witnesses, that the agents entered the Messalas home at or after 6:00 a.m., in compliance with the terms of the warrant and Federal Rule of Criminal Procedure 41.

Messalas presents a number of arguments seeking to establish, based on the evidence presented at the hearing as well as other evidence, that the search warrant was executed prior to 6:00 a.m. None of the arguments is persuasive, or provides a basis to disregard the credible, independently corroborated testimony of the three FBI witnesses as to the time the warrant was executed.

First, Messalas discounts the testimony of Agents Donohue and Luca regarding the time of entry, arguing that the agents testified "based on general practice." (Def. Post-Hearing Brief at 11.) According to Messalas, the Government "cannot sustain its burden by relying on generalized testimony about standard protocol and what agents 'would' or 'should' have done in a normal case." (*Id.* at 21.) In making this argument, Messalas ignores Grady's testimony about the agents' time of entry. Grady stated that she recalled agents "went into the house" at "a few minutes after 6 [a.m.]" (Grady at 174.) Moreover, while Agent Luca did appear to refer to FBI practice in testifying about the time of entry at one point in his testimony, his later testimony was more definitive. When asked whether agents entered the house at 5:20 a.m., Agent Luca replied, "Absolutely not." (Luca at 37.) Then, when asked what time the agents in fact entered the house, Agent Luca replied, "After 6 a.m." (*Id.*)

Messalas also points to Mongelli's testimony that it was "extremely dark" when agents entered the home, and Agent Donohue's similar testimony that it was "still dark," as evidence that the agents entered the Messalas home prior to 6:00 a.m. of the agents' time of entry. (Mongelli at 144; Donohue at 190; Def. Post-Hearing Brief at 18.) Messalas also relies on photos taken exactly two years after the date of the search to argue that it would not have been dark at 6:00 a.m. in front of the Messalas's home. (Def. Post-Hearing Brief at 18; Def. Exs. 29A–E.) Even setting aside the Court's finding regarding the credibility of Mongelli's

18

testimony, Messalas fails to establish the evidentiary value of this testimony. Messalas provides no explanation as to how the Court can reliably determine how bright it was outside Messalas's home *two years earlier* on the basis of photos taken in 2019, or on Mongelli's general recollection, even if credited. Thus, this evidence carries no weight in determining the agents' time of entry.

Finally, despite confident assertions, Messalas's arguments questioning the plausibility of the FBI witnesses' timeline with respect to the time of entry and subsequent departure for 26 Federal Plaza amount to nothing more than speculation. (Def. Post-Hearing Brief at 23–25.) Messalas provides no basis for the Court to conclude that the drive from Messalas's residence to 26 Federal Plaza, in reduced holiday traffic, could not have been accomplished in the 30 to 40 minutes as the agents credibly testified. (Donohue at 217; Def. Post-Hearing Brief at 23–25.) Similarly, besides reciting the series of events that took place in Messalas's home that morning, Messalas provides no basis for the Court to conclude that a full FBI team could not accomplish all the reported tasks in the 20 to 30-minute period between the time of entry and Agent Donohue's departure. (Def. Post-Hearing Brief at 22–24.)

Mongelli's testimony, even if credited, would be of little help on this issue. Although Mongelli estimated that Agent Donohue was in the house for "at least an hour" before departing with Messalas, (Mongelli at 118–119), she later testified that she did not have access to a clock after she awoke. (*Id.* at 145.) Describing how she kept track of time, Mongelli testified, "I think I was looking out the window." (*Id.* at 144.)

In contrast, the Government's timeline for the search, including the time of Agent Donohue's departure with Messalas, is supported by each of the FBI witnesses' testimony, as well as the photo of Agent Donohue's phone calling Messalas's phone taken at 6:24 a.m., (Def.

19

Ex. 10-A; *see also* Def. Ex. 8), and Agent Donohue's subsequent email at 6:35 a.m. that read, "On our way." (Gov't Ex. 4.)

In sum, because the Court finds that agents executed the search warrant at Messalas's residence at or after 6:00 a.m., in compliance with the terms of the warrant and Federal Rule of Criminal Procedure 41, Messalas is not entitled to suppression of the fruits of the search based on the time at which the warrant was executed.

## CONCLUSION

For the reasons set forth above, Messalas's motion to suppress the fruits of the search of his home is denied.

SO ORDERED.

Dated: Brooklyn, New York
       July 10, 2020

*Roslynn R. Mauskopf*

_____
ROSLYNN R. MAUSKOPF
Chief United States District Judge